UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEORGE GUNTER,

    Plaintiff,

    v.

ANTHONY O. CICERO and JOHN LOPEZ,

    Defendants.

Civil Action No. 16-30183-MGM

MEMORANDUM & ORDER REGARDING
PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,
IN THE ALTERNATIVE, FOR A NEW TRIAL
(Dkt. No. 123)

March 11, 2019

MASTROIANNI, U.S.D.J.

    In this civil rights case, Plaintiff George Gunter alleged Defendants Anthony Cicero and

John Lopez—both police officers in Springfield, Massachusetts—unlawfully stopped him, assaulted

him in the process of stopping and arresting him, and brought criminal charges against him in

violation of federal and Massachusetts law. The case was tried before a jury, which returned a verdict

in Defendants' favor on all counts.

    At the close of the evidence, Plaintiff moved for judgment as a matter of law on Counts I

and II (unlawful seizure in violation of the Fourth Amendment to the United States Constitution

and Article 14 of the Massachusetts Declaration of Rights, respectively).[1] (Dkt. No. 112.) The Court

heard argument and denied the motion at sidebar. After trial, Plaintiff renewed the motion and, in

---

[1] Count I asserts a federal civil rights claim under 42 U.S.C. § 1983. Count II asserts a state civil rights claim under the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, §§ 11H & 11I. "The MCRA is the state analog to § 1983 and provides a cause of action for an individual whose rights under the constitution or laws of either the United States or the Commonwealth of Massachusetts have been interfered with by 'threats, intimidation or coercion.'" *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (quoting G.L. c. 12, §§ 11H & 11I).

the alternative, sought a new trial on those counts. (Dkt. No. 123.) Defendants opposed the renewed

motion, arguing the seizure was lawful and, even if it was not, Defendants are entitled to qualified

immunity. (Dkt. No. 126.) Defendants also contend Plaintiff has not met his burden of establishing

a new trial is warranted. The court heard argument on the matter on January 16, 2019. At the

hearing, the court requested the parties order the final trial transcripts so there would be a record on

which the court could rely in considering Plaintiff's motion. The parties did so, and, on February 22,

Plaintiff filed a supplemental memorandum in which he provided citations to the transcripts

supporting his summary of the facts presented at trial. (Dkt. No. 137.) Defendants filed their

supplemental memorandum on March 6. (Dkt. No. 138.)

For the reasons set forth below, Plaintiff's renewed motion for judgment as a matter of law

on Counts I and II will be granted. Defendants are not entitled to qualified immunity on either

count. Plaintiff's motion for a new trial will be conditionally denied.

## I.   FACTUAL BACKGROUND

The following facts are based on the evidence introduced at trial.

On the night of Monday, September 14, 2015 and into the early morning of Tuesday,

September 15, 2015, Defendants were on duty working the midnight to 8:00 a.m. shift. They

participated in roll call at the police station at 10:45 p.m.[2] and then patrolled the downtown

Springfield area.

At approximately 2:00 a.m. on September 15, 2015, Plaintiff was walking on Market Way[3] in

downtown Springfield between Harrison Avenue and Falcon Way. Plaintiff testified he had gone out

---

[2] The ordinary overnight shift is midnight to 8:00 a.m. the following morning. Roll call for that shift starts at 11:45 p.m. Some officers arrive an hour early for roll call at 10:45 p.m. The purpose of some officers arriving early is to have coverage during the shift change. Defendants were among those officers who arrived for the 10:45 p.m. roll call.

[3] There was differing testimony describing Market Way as a pedestrian walkway or an alley; in any event, Market Way is a pedestrian-accessible way in downtown Springfield that is narrower than an ordinary street.

that night (starting the night of Monday, September 14) to celebrate his upcoming birthday. He had been at a gentleman's club called Center Stage, was hungry, and was on his way to Crown Fried Chicken, a several-minute walk from the club.

As Plaintiff walked south on Market Way toward Falcon Way, Defendants drove east up Harrison Avenue. Defendant Lopez was driving, and Defendant Cicero was in the passenger seat. Defendant Cicero saw Plaintiff on Market Way. Defendant Cicero testified: "I saw somebody coming or walking on Harrison. It sort of seemed like he was coming out of a building."[4] (10/30/18 Trial Tr. (Dkt. No. 133) at 109:9-11.) When defense counsel sought to confirm Defendant Cicero "had seen [Plaintiff] coming out of the rear of a building," Defendant Cicero responded, "That's what I believed I saw. It was poorly lit, so." (*Id.* at 111:10-13.) On cross-examination, Plaintiff's counsel asked, "And you testified that when you were driving east on Harrison Avenue that you looked to your right and you saw somebody come out of a building on Marketplace [sic]; is that right?" (*Id.* at 135:24-136:2.) Defendant Cicero replied, "What I believed to be happening, yes." (*Id.* at 136:3.) He "couldn't tell," though, which business (if any) he saw Plaintiff exit. (*Id.* at 136:8-10.) Defendant Cicero further testified that he saw Plaintiff on the end of Market Place closer to Harrison Avenue than to Falcon Way, but Defendant Cicero did not know which businesses were on that street, and he did not document the businesses in his report.

Defendant Cicero told Defendant Lopez he had seen someone on Market Way. Defendant Lopez continued driving east, up the rest of the block on Harrison Avenue. He then took a right onto Dwight Street and a second right onto Falcon Way and proceeded to where Market Way meets Falcon Way. Defendants saw Plaintiff coming out of Market Way onto Falcon Way and intercepted him there. The parties' testimony differed as to what happened next. But because the court views

---

[4] Defendant Cicero subsequently clarified that he and Defendant Lopez were on Harrison Avenue, and Plaintiff was on Market Way. (*See* 10/30/18 Trial Tr. (Dkt. No. 133) at 109:12-13.)

the evidence in the light most favorable to Defendants in assessing both the motion for judgment as a matter of law and whether Defendants are entitled to qualified immunity, the court summarizes Defendants' version of events.

Both Defendants testified that during the 10:45 p.m. roll call, the supervising sergeant (Sergeant Philip McBride) informed them there had been break-ins in the Market Way area. Sergeant McBride testified at trial and initially explained he worked the midnight to 8:00 a.m. shift on September 15, 2015, he arrived at the police department at 11:20 or 11:30 p.m. before the shift started, and roll call began at 11:45 p.m. He later testified it was possible he arrived earlier and was there for the 10:45 p.m. roll call, in which case Defendants would have encountered him then. Either way, he did not recall having a conversation with Defendants or giving them any information about Market Way or break-ins in the surrounding area.

Based on Sergeant McBride's purported warnings, Defendant Cicero was suspicious of Plaintiff's presence on Market Way because it was after business hours, and Defendant Cicero believed there had been recent break-ins in the area. But Defendant Cicero did not see broken glass, hear an alarm, or see Plaintiff running or carrying anything that might indicate he had broken into a building. Moreover, neither Defendant could identify a single report of, investigation into, or prosecution related to a break-in on Market Way leading up to September 15, 2015. Call for service records showed that there had not been any report of a break-in on Market Way from January 1, 2015 through September 14, 2015. There was testimony that had any buildings on Main Street, which back up to Market Way, been broken into, records of any such break-in would not appear on call for service records for Market Way. Here, neither Defendant returned to Market Way after Plaintiff was arrested to investigate whether there had in fact been a break-in.

Defendant Cicero testified that when Defendants drove up to Plaintiff on Falcon Way, they wanted to conduct a field interview to find out Plaintiff's name and what he had been doing on

Market Way. So when Defendants approached Plaintiff, Defendant Cicero called out to him from the cruiser and asked what he was doing. Defendants testified Plaintiff did not respond and kept walking across Falcon Way. Defendant Lopez then asked Plaintiff where he was going and to come over to the cruiser, and—according to Defendants—Plaintiff again did not respond and kept walking. According to Defendants, this further raised their suspicions. They got out of the cruiser and seized Plaintiff by telling him to stop, which he did. Specifically, Defendants said to Plaintiff, "hey, hey, hold up." (*Id.* at 113:6-9, 113:17-19.) Defendant Cicero testified about this interaction as follows:

Q:   What was your intent in speaking to Mr. Gunter?

A.   Our intent was just to find out what he was doing in the alley, possibly his name, and that's about it.

* * *

Q.   And so what happened when you approached Mr. Gunter as he emerged from Market Way?

A.   I asked him, what are you doing and he continued to walk away.

Q.   What direction was he walking at that point?

A.   He was walking across the street towards the MassMutual Center.

Q.   Did you -- were you in the car at this point in time?

A.   Yes.

Q.   At that point in time did you have -- or when you first encountered Mr. Gunter, did you have any intention of getting out of the car?

A.   No.

Q.   So what happened after you spoke to him and do I understand he failed to respond to you?

A.   Yes.

Q.   So what happened next?

A.   He walked around the rear of the cruiser and continued to walk across the street.

5

Q.    And what, if anything, happened then?

A.    Officer Lopez said to him, hey, where are you going?

Q.    Okay. And can you describe what happened from that point?

A.    He just kept walking.

Q.    And what significance did that have to you?

A.    It raised my suspicions even further that he was up to some kind of criminal activity.

* * *

Q:    Did [Mr. Gunter] say anything about why he was on Market Street when you tried to make contact with him?

A:    Mr. Gunter would not answer our questions.

Q:    If he had told you that he was on his way from a bar on Dwight Street to a restaurant at the corner of State and Main, how would that affected [sic] the way you dealt with him?

A:    If Mr. Gunter answered our questions and engaged with us, he probably -- we probably would have just taken a field interview report and he would have walked away.

Q:    Would you have ever even gotten [out] of the car if he had answered some of your questions?

A:    No.

(*Id.* at 111:3-6, 111:21-112:22, 151:8-20.)[5]

According to Defendants, Plaintiff's hands were in his pockets; after Defendants exited the cruiser, they asked him to remove his hands, but he did not. Defendants became concerned Plaintiff was trying to hide something, like a weapon. They asked him a few times to take his hands out of his pockets, but he did not. Both Defendants testified that they held Plaintiff's upper arm or shoulder to

---

[5] In his closing, defense counsel argued along these same lines, contending Defendants just wanted to talk to Plaintiff; if Plaintiff had answered their questions and explained what he was doing on Market Way after businesses hours, that would have ended the encounter; instead, Plaintiff did not engage with Defendants; and he had his hands in his pockets. Counsel later reiterated that if Plaintiff had answered Defendants' questions, he would have been able to go on his way.

escort him to the cruiser, where it would be easier to perform a pat frisk for weapons. A struggle ensued during which Plaintiff struck Defendant Lopez in the side of the face and struck Defendant Cicero in the stomach. Plaintiff slipped out of his sweatshirt, fled the scene, and was later found near City Hall. While Plaintiff testified Defendant Lopez raised his baton during their encounter on Falcon Way, Defendant Lopez testified he not raise or use his baton, and, moreover, he had put his baton and hat in the cruiser's trunk at the beginning of his shift and did not remove them. Defendant Cicero also testified he did not see Defendant Lopez take out his baton or have it in his hand. Additional facts regarding Defendants' search for and eventual arrest of Plaintiff are not relevant to the present motion.

## II.        LEGAL STANDARD

Judgment as a matter of law against a party is appropriate when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for th[at] party on that issue." Fed. R. Civ. P. 50(a)(1). A party may move for judgment as a matter of law during trial. *See id.* at 50(a)(2). If the court denies the motion and the jury returns a verdict against the movant, that party can file a renewed motion and may, in the alternative, request a new trial. *See id.* at 50(b); *see also United States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir. 1984) ("[E]ven after a jury has rendered a verdict, if the trial court decides after careful reconsideration that the evidence was insufficient to submit the case to the jury after all, it has the power to grant a judgment *non obstante veredicto* and reverse the jury's verdict.") (citing Fed. R. Civ. P. 50(b)).

"[T]he standard for prevailing on a motion under Fed. R. Civ. P. 50 is demanding." *Sanchez v. Foley*, No. 15-cv-10120-DJC, 2018 WL 4375096, at *1 (D. Mass. Sept. 13, 2018). The court must view the "evidence and the inferences reasonably drawn therefrom . . . in the light most favorable to the non-movant." *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186 (1st Cir. 1996). But the court cannot "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of

the evidence." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir. 1987). Judgment as a matter of law may be entered "only if the evidence, viewed from this perspective, would not permit a reasonable jury to find in favor of the [non-movant] on any permissible claim or theory." *Andrade*, 82 F.3d at 1186 (internal quotation marks and citation omitted).

Juries may be asked to return general verdicts, special verdicts (which require written findings on factual issues), or general verdicts together with written answers to factual questions. *See* Fed. R. Civ. P. 49. Here, the jury completed a form titled "Special Verdict Form" that was divided into sections based on each count and each Defendant. (Dkt. No. 122). It contained a series of general verdict questions on the issue of liability for each Defendant on each count. If the jury answered "yes" to any general verdict question (e.g., "Did the Plaintiff prove by a preponderance of the evidence that Defendant Anthony Cicero intentionally or recklessly committed an act that violated the Plaintiff's Fourth Amendment right to be free from an unreasonable seizure?" (*id.*)), it was directed to answer follow-up questions on disputed issues, such as causation and harm (e.g., "[If you answered 'yes' to the previous question,] [d]id the Plaintiff prove by a preponderance of the evidence that the Defendant Anthony Cicero's unreasonable seizure of the Plaintiff caused him actual injury?" (*id.*)). The jury answered each general verdict question on liability in Defendants' favor, so it did not answer any follow-up question, and it did not reach the sections of the verdict form on compensatory and punitive damages. When considering a motion for judgment as a matter of law, the court is not bound to follow the jury's verdict, but it may be guided by the jury's answers to special questions. *See, e.g., Ciolino v. Gikas*, 861 F.3d 296, 301 (1st Cir. 2017) ("District courts may submit 'special interrogatories to the jury' in order to elicit factfinding that is relevant to the court's legal conclusion on qualified immunity.") (quoting *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 34 n.9 (1st Cir. 2002)). The jury here, though, was not asked and did not answer factual questions similar to what might be asked in a special interrogatory (e.g., "Did the Plaintiff exit a

building on Market Way?" or "Were the Plaintiff's hands in his pockets when the Defendants confronted him on Falcon Way?").

### III.     ANALYSIS

**A.     Defendants Did Not Have Reasonable Suspicion to Seize Plaintiff.**

Both the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights prohibit unreasonable seizures. "A detention at the hands of a police officer constitutes a seizure of the detainee's person and, thus, must be adequately justified under the Fourth Amendment." *Morelli v. Webster,* 552 F.3d 12, 19 (1st Cir. 2009). The reasonableness of a seizure depends on balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The same is true for a seizure assessed under Article 14. *See Landry v. Attorney Gen.*, 429 Mass. 336, 348 (1999) ("As is the case with the Fourth Amendment, a warrantless search and seizure violates art. 14 only if it is unreasonable. Under art. 14, we determin[e] reasonableness . . . by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.") (internal quotation marks and citations omitted).

### 1.     Fourth Amendment

The seizure in this case occurred during an investigatory stop. Under *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny, "police officers who suspect criminal activity [can] make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698 (1981). But these limited intrusions are justified only "so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699. In particular, an investigatory stop must be based on "articulable facts giving rise to a reasonable suspicion that a [person] may be involved in criminal activity." *Morelli*, 552 F.3d at 20 (citation omitted). The "court must determine whether a police

officer's initial action was justified and, if so, whether subsequent (more coercive) actions undertaken by the officer were justified by developing circumstances." *Id.* at 19. Whether an officer's conduct "was justified at its inception depends on the totality of the circumstances confronting the officer." *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir. 1987).

> Police

>> do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). But "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business . . . or to stay put and remain silent in the face of police questioning." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (internal citation omitted); *see also Royer*, 460 U.S. at 497-98 ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."); *see also Terry*, 392 U.S. at 33 (Harlan, J., concurring) (a person who is approached has the "right to ignore his interrogator and walk away"). In these circumstances, "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *see also Royer*, 460 U.S. at 498 ("He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.").

*United States v. Dapolito*, 713 F.3d 141 (1st Cir. 2013), is instructive. Officers patrolling downtown Portland, Maine saw Mr. Dapolito standing alone in an alcove in front of a condominium. *Id.* at 144. He said he was okay, but he was "grimacing, squinting, and making strange facial expressions," and he was sweating, fidgeting, and appeared to be intoxicated or impaired. *Id.*

Some of his statements were rambling and incoherent. *Id.* at 144. He said he lived in the building, but he did not have a key. *Id.* at 145. The officers were patrolling the area because of recent burglaries and graffiti incidents, but they did not have any information about recent burglaries in the particular area where Mr. Dapolito was standing. *Id.* at 144. Nor did they see any evidence he "had been involved in a burglary and he did not appear to have any of a burglar's usual tools." *Id.* The officers twice asked him for his name: the first time, he either omitted one letter from the spelling or the officers misheard him and believed he omitted a letter; the second time, he spelled it correctly. *Id.* at 144-45. The second, correct spelling matched the spelling on his Massachusetts Electronic Benefit Transfer card he had given the officers. *Id.* at 145. The officers asked dispatch to run both spellings, but no records hit on either. *Id.* at 144-45. Mr. Dapolito twice refused to consent to being searched, explaining he was not comfortable being touched. *Id.* at 145-46. The officers continued questioning him, escalating the interaction to the point where an officer told him they would take him to jail. *Id.* at 145. He said he did not want that, took what the officers described as a "fight or flight stance," and asked if he could take three steps back. *Id.* at 146. An officer said "no" and told Mr. Dapolito to put his hands on his head. *Id.* He initially did not comply, so a second officer drew and pointed his Taser at Mr. Dapolito's chest. *Id.* He then complied and put his hands on his head, which revealed a handgun in his waistband. *Id.* A further records search showed he had a felony conviction but did not show he was wanted for a crime. *Id.*

The district court suppressed the handgun, finding that the officers lacked reasonable suspicion to detain Mr. Dapolito at the start of the *Terry* stop. *Id.* The government appealed, arguing that the consensual stop lawfully evolved into a *Terry* stop "because there was reasonable suspicion of criminal activity afoot . . . at the time of the search"; the government did not argue "the officers independently feared for their safety . . . when they told Dapolito to put his hands on his head, pointed the Taser at him, and placed the red Taser light on his chest." *Id.* at 147. The First Circuit

affirmed, finding "[i]t was both legitimate and reasonable for the [district] court to consider whether, as a factual matter, the area was actually the scene of recent crimes." *Id.* at 149. There was no evidence that the area where Mr. Dapolito was standing was a hot spot or that it had any recent burglaries. *Id.* at 151.

> Moreover, [Mr. Dapolito's] behavior did not tie him to a burglary. There was no evidence [he] was fiddling with doorways or even with the ATM in the alcove. The officers did not see any tools of the trade, such as pliers or a pry bar, on or near [him] that would be used in a burglary. And, unlike in *Terry*, 392 U.S. at 6-7, 88 S. Ct. 1868, the officers did not observe any suspicious behavior, like [he] was casing a building.

*Id.* In short, there was no reasonable suspicion of a crime at the time officers told him they would take him to jail. *Id.* at 153. It was reasonable for officers to approach Mr. Dapolito and to speak with him to determine if he needed help or "if criminal activity was afoot." *Id.* But where "the police did not have reasonable suspicion to believe that the defendant had been or was going to be engaged in a crime, the consensual inquiry . . . cannot be converted into an investigatory stop." *Id.*

## 2.     Article 14 of the Massachusetts Declaration of Rights

Under Article 14 of the Massachusetts Declaration of Rights, like under the Fourth Amendment, "[n]ot every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions that requires justification." *Commonwealth v. Gomes*, 453 Mass. 506, 510 (2009). "'The particular character of such an encounter will determine' what level of justification, if any, is required." *Commonwealth v. Narcisse*, 457 Mass. 1, 5 (2010) (quoting *Commonwealth v. Lyles*, 453 Mass. 811, 814 (2009)). The police may stop an individual if there is reasonable suspicion to believe he "has committed, is committing, or is about to commit a crime." *Commonwealth v. Silva*, 366 Mass. 402, 405 (1974). That suspicion must be based on "specific and articulable facts." *Id.* 406 ("[W]e have required that the police officer's action be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of

the officer's experience.") "A mere 'hunch' is not enough. Simple good faith on the part of the

officer is not enough." *Id.*

"[A] seizure for art. 14 purposes may be effectuated by police conduct that falls short of the

physical detention of the [individual]." *Commonwealth v. Franklin*, 456 Mass. 818, 821-22 (2010). A

"[p]ursuit that appears designed to effect a stop is no less intrusive than the stop itself. In other

words, the officer's right to pursue when a stop appears imminent can be no broader than his right

to stop." *Commonwealth v. Thibeau*, 384 Mass. 762, 764 (1981). Accordingly, police "must have

reasonable suspicion for pursuit to begin." *Commonwealth v. Grandison*, 433 Mass. 135, 138 (2001).

"'[P]ursuit begins when action by police would communicate[] to the reasonable person an attempt

to capture or otherwise intrude on [an individual's] freedom of movement.'" *Id.* (quoting

*Commonwealth v. Watson*, 430 Mass. 725, 731 (2000)). "'It occurs when police attempt to stop an

individual to effectuate a threshold inquiry.'" *Grandison*, 433 Mass. at 138 (quoting *Watson*, 430 Mass.

at 731).

Article 14 is more protective than the Fourth Amendment when it comes to determining the

moment when an individual has been seized. *See Lyles*, 453 Mass. at 812 n.1 ("We have held that art.

14 provides more substantive protection than does the Fourth Amendment in defining the moment

when an individual's personal liberty has been significantly restrained by police such that the

individual may be said to have been 'seized' within the meaning of art. 14.") (citing *Commonwealth v.*

*Stoute*, 422 Mass. 782, 786-89 (1996)). As a result, if Article 14's "standards are satisfied, then so too

are those of the Fourth Amendment." *Lyles*, 453 Mass. at 812 n.1 (citation omitted).

When police approach an individual but have less than reasonable suspicion, that person can

refuse to speak with police and walk away. *See Commonwealth v. Barros*, 435 Mass. 171, 178 (2001)

(breaking eye contact and refusing to answer officer's initial questions "cannot provide reasonable

suspicion for justification of a detention or seizure [because] [i]t was the defendant's right to ignore

the officer"); *Narcisse*, 457 Mass. at 6 ("Such interactions, field interrogation observations, . . .

properly are deemed consensual encounters because the individual approached remains free to

terminate the conversation at will. That is, they are constitutionally insignificant, and a police officer

may initiate such an encounter without any information indicating that the individual has been or is

presently engaged in criminal activity.") (internal citations omitted); *see also Commonwealth v. Warren*,

475 Mass. 530, 538 (2016) ("Unless reasonable suspicion for a threshold inquiry already exists, our

law guards a person's freedom to speak or not to speak to a police officer. A person also may

choose to walk away, avoiding altogether any contact with police."); *Commonwealth v. Meneus*, 476

Mass. 231, 240 (2017) ("Having not consented to the patfrisk, the fact that the defendant backed

away from the scene permits no inference of criminal activity.").[6] Indeed, "suspicion must be

reasonable *before* the [stop] beings. Were the rule otherwise, the police could turn a hunch into a

reasonable suspicion by inducing the conduct justifying the suspicion." *Thibeau*, 384 Mass. at 764

(emphasis added).

###    3.    Application

Based on Fourth Amendment and Article 14 jurisprudence, the seizure in this case was

unreasonable. In particular, the reasoning from *Dapolito*, described above, applies here. Defendants

here were not justified in converting their initial encounter with Plaintiff into a *Terry* investigative

stop. Defendant Cicero saw Plaintiff on Market Way and—at most—believed he might have been

coming from a building. There was no evidence of a break-in or that Plaintiff had engaged or was

engaging in criminal activity. He was walking—not running—on a publicly-accessible way; he was

not carrying anything that might indicate he had been involved with a break-in—no backpack or

---

[6] *Warren* and *Meneus* were both decided after the incident in this case, but the rule for which the court cites them—that, absent reasonable suspicion, an individual can ignore the police—existed long before. *See, e.g.*, *Barros*, 435 Mass at 178; *Narcisse*, 457 Mass. at 6.

other bag, no tools, no equipment, no merchandise. Nothing in Defendants' testimony indicates

they were in any hurry to stop Plaintiff. Urgency on Defendants' part might have shown they

believed Plaintiff was involved in criminal activity. Rather than immediately exiting the cruiser to talk

to Plaintiff when Defendant Cicero first saw him, Defendants drove all the way around the block.

The evidence most helpful to Defendants is their own assertions that there had been break-ins in the

area, but they observed nothing consistent with such activity other than Plaintiff's presence in the

area at a late hour. Further, their supervisor does not remember whether he was at the same roll call

as Defendants and does not remember giving them any specific instructions. The call for service

records for Market Way for more than eight months before the night in question do not show any

reports of break-ins in the preceding calendar year (though records of break-ins of buildings on

Main Street that backup onto Market Way would not have been in those records).

When Defendants first spoke to Plaintiff, he—according to Defendants—did not answer

their initial questions about where he was coming from and where he was going, and he kept

walking across Falcon Way. Plaintiff did not run, and there was no evidence he appeared intoxicated

or engaged in irrational conduct. In short, Plaintiff did not act in any way that would support a

conclusion other than, for the most part, he ignored the police. *See Royer*, 460 U.S. at 497-98.

Defendant Cicero, though, specifically testified that if Plaintiff had answered the officers' questions,

they would not have gotten out of the cruiser. (10/30/18 Trial Tr. (Dkt. No. 133) at 151:11-20.) But

even if Plaintiff did not answer Defendants' initial questions, his refusal was lawful and did not give

Defendants reasonable suspicion to escalate the initial encounter into a *Terry* stop. *See Bostick*, 501

U.S. at 437 ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective

justification needed for a detention or seizure."); *Barros*, 435 Mass. at 178 (refusing to answer

officer's questions "cannot provide reasonable suspicion for justification of a detention or seizure").

This is true here particularly because, like in *Dapolito*, Defendants have not argued they

15

independently feared for their safety when, as they asserted, Plaintiff would not remove his hands

from his pockets.[7] But even assuming Plaintiff had his hands in his pockets, that paired with his

initial refusal to answer questions, without more, did not create reasonable suspicion. *See Burton*, 228

F.3d at 528; *Adams*, 407 U.S. at 146. As a result, Defendants' seizure of Plaintiff clearly violated the

Fourth Amendment and most certainly violated the stronger protections of Article 14 of the

Massachusetts Declaration of Rights.

**B.      Defendants Are Not Entitled to Qualified Immunity.**

"A government official sued under § 1983 is entitled to qualified immunity unless the official

violated a statutory or constitutional right that was clearly established at the time of the challenged

conduct." *Carroll v. Carman,* 135 S. Ct. 348, 350 (2014) (per curiam). The same is true for an official

sued under the MCRA. *See Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (MCRA claims subject

to same immunity standard as § 1983 claims) (citing *Duarte v. Healy*, 405 Mass. 43, 46-47 (1989)).

"The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, 'from an

---

[7] The closest Defendants come to making this argument is their claim that "[n]ervous, uncooperative and evasive behavior, not maintaining eye contact and backing away from officers with ones [sic] hands in their [sic] pocket on [sic] a poorly lit, otherwise deserted location is behavior that the court has found to reasonably increase officers' suspicions of criminal activity." (Defendants' Opp. (Dkt. No. 126) at 4.) From this list, only Plaintiff having his hands in his pockets is present here; Plaintiff was not suspiciously evasive but was clearly under his right when avoiding or ignoring police. In terms of lighting, Defendant Cicero testified that Market Way "wasn't very well lit" and "[y]ou can't see much there unless you're actually on the Falcon Way side where it's more illuminated." (10/30/18 Trial Tr. (Dkt. No. 133) at 108:16-23; *see also id.* at 111:10-13 (Defendant Cicero explaining that area where he believed he saw Plaintiff coming out of a building was "poorly lit").) Defendants interacted with Plaintiff on Falcon Way, and there was no testimony that Falcon Way was poorly lit.

Given Defendants did not have reasonable suspicion when they first approached Plaintiff, his refusal to answer questions and having his hands in his pockets do not create reasonable suspicion and do not justify a pat frisk or other safety-related search. *See United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) ("[A]n officer may not conduct [a] protective search for purposes of safety until he has a reasonable suspicion that supports the investigatory stop."); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."). The same is true under Massachusetts law. *See Narcisse*, 457 Mass. at 9 ("[W]e state expressly that police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense *and* is armed and dangerous.") (emphasis in original); *Commonwealth v. Martin*, 457 Mass. 14, 19-20 (2010) (same).

objective standpoint, should have known that their conduct was unlawful.'" *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014)). In other words, "[t]his doctrine 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Carroll*, 135 S. Ct. at 350 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

There is "a two-prong analysis to determine whether an officer is protected by qualified immunity." *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) (internal quotation marks and citation omitted). First, has the plaintiff established a violation of a constitutional right, and second, if so, was "the law clearly established at the time of the defendant's alleged violation"? *Id.* (internal quotation marks and citation omitted).

The second prong has two sub-parts: "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson v. Lane*, 526 U.S. 603, 617 (1999)). "[T]his analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Alfano*, 847 F.3d at 76 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) ("the clearly established right must be defined with specificity" and not "at a high level of generality") (internal quotation marks and citation omitted). "The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed." *Mitchell*, 790 F.3d at 77. Even so, there need not be existing case law addressing the precise factual situation an officer encounters; instead, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Alfano*, 847 F.3d at 76 ("[I]t is enough if the existing precedents establish the applicable legal rule with sufficient clarity and

specificity to put the official on notice that his contemplated course of conduct will violate that rule.").

The second sub-part of the second prong

> asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law. The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted.

*Alfano*, 847 F.3d at 75 (internal citations omitted); *see also City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate.") (internal quotation marks and citations omitted) (alterations in original). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis omitted) (quoting *al-Kidd*, 563 U.S. at 742).

In assessing qualified immunity, the court gives deference to the jury's verdict and views the evidence in the light most favorable to the party who prevailed. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140, 147 (1st Cir. 2003) ("When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial . . . [I]n such an exercise, deference should be accorded the jury's discernible resolution of disputed factual issues.") (internal quotation marks and citation omitted); *accord Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) ("Because there was a jury verdict in favor of the defendant commanders prior to the grant of judgment as a matter of law, we construe the evidence in the light most favorable to them.") (citing *Jarrett*, 331 F.3d at 147). Here, the jury found in Defendants' favor on liability for every count. The court therefore construes the verdicts as meaning the jury accepted

Defendants' version of events, and the court views the evidence in the light most favorable to Defendants.

Here, because the court already determined Defendants violated Plaintiff's clearly-established constitutional rights, only the second prong of the qualified immunity analysis is at issue.

### 1. Controlling Federal and State Authorities Specifically Define the Rights at Issue.

Turning to the first sub-part of prong two, Plaintiff identified controlling authority that specifically defines the rights at issue in this case. It is a bedrock principle of Fourth Amendment jurisprudence that police cannot conduct an investigatory stop without reasonable suspicion—based on articulable facts—to believe the person stopped may be engaged in criminal activity. *See Morelli*, 552 F.3d at 20 (an investigatory stop must be based on "articulable facts giving rise to a reasonable suspicion that a [person] may be involved in criminal activity") (citation omitted); *Silva*, 366 Mass. at 405-06 (police may stop an individual if, based on "specific and articulable facts," there is reasonable suspicion to believe he "has committed, is committing, or is about to commit a crime"). Moreover, as explained above, in the absence of reasonable suspicion, pedestrians have the right to walk away from an encounter with the police. *See Wardlow*, 528 U.S. at 125; *Barros*, 435 Mass. at 178; *Narcisse*, 457 Mass. at 6. Individuals also have the right to not be subjected to a pat frisk or other safety-search in the absence of reasonable suspicion. *See Burton*, 228 F.3d at 528; *Adams*, 407 U.S. at 146; *Narcisse*, 457 Mass. at 9; *Martin*, 457 Mass. at 19-20.

Applying these rights to the facts of the case does not tip the balance in Defendants' favor. Assuming Defendants had been warned of recent break-ins in the Market Way area, Defendant Cicero's vaguely articulated and seemingly uncertain "belief" that he saw someone exit some unidentified building does not rise to the level of reasonable suspicion. This is especially true because Plaintiff was not running when Defendant Cicero first saw him, did not run away from the police or even change direction when they approached, and was not holding any bags, tools, or

other items that may have indicated he had been involved in a break-in. The seizure—which

occurred either when Defendants said, "hey, hey hold up," which caused Plaintiff to stop, or when

Defendants grabbed Plaintiff[8]—was based on less than reasonable suspicion and violated Plaintiff's

clearly established rights. And Defendants preventing him from exercising his clearly established

"right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125.

### 2.  A Reasonable Officer Would Have Known the Stop Violated Plaintiff's Rights.

The second sub-part of prong two requires the court to answer whether a reasonable officer

would have known the *Terry* stop violated Plaintiff's well-established rights. Based on the cases cited

above—which were decided before the incident in this case—a reasonable officer would have

known the stop violated Plaintiff's rights. *See Wardlow*, 528 U.S. at 125; *Royer*, 460 U.S. at 497-98

*Terry*, 392 U.S. at 33 (Harlan, J., concurring); *Bostick*, 501 U.S. at 437; *Barros*, 435 Mass. at 178;

*Narcisse*, 457 Mass. at 6. Numerous other cases (also decided before the incident in this case), where

articulable facts giving rise to reasonable suspicion were lacking where a person walked away from

or did not cooperate with police, bolster that conclusion. *See, e.g.*, *Martin*, 457 Mass. at 21-22

("Because it was within the defendant's right to ignore questions posed by the officers, his refusal to

answer Officer Henriquez's question concerning whether he had a weapon cannot provide

reasonable suspicion for his seizure. In sum, the defendant did not appear to be engaged in criminal

---

[8] Under Massachusetts law, the seizure occurred when, after Defendants exited the cruiser, they told Plaintiff to "hold up." (10/30/18 Trial Tr. (Dkt. No. 133) at 113:6-9, 113:17-19.) *See Commonwealth v. Mock*, 54 Mass. App. Ct. 276, 278 (2002) (police officer getting out of cruiser, following defendant, and telling him to "stop" constituted seizure); *Commonwealth v. Smith*, 55 Mass. App. Ct. 569, 571-72 (2002) (officer approached three people in alleyway, identified himself as police, and asked what they were doing; they did not respond, and officer told them to stop; court held seizure occurred when officer initially ordered them to stop); *Commonwealth v. Clarke*, No. 01-P-310, 2002 WL 31322649, at *2 (Mass. App. Ct. Oct. 15, 2002) ("A police officer's use of the word 'stop' conveys to a reasonable person that compliance is not optional and that he or she is not able to leave."). There is no question under either Massachusetts or federal law—and both parties agree—that Plaintiff was seized when Defendants grabbed him. (*See* Plaintiff's Br. (Dkt. No. 124) at 7; Defendants' Opp. (Dkt. No. 126) at 2.) Regardless, the precise moment when the seizure occurred is not outcome determinative in this case because Defendants did not have reasonable suspicion at any time.

activity, let alone likely to lash out with a weapon. Neither prong of *Terry* having been satisfied, the simultaneous seizure and search of the defendant lacked adequate constitutional justification.") (internal citation omitted); *Commonwealth v. Dasilva*, 56 Mass. App. Ct. 220, 223-26 (2002) (defendant, who officers knew had recently been stabbed and who appeared to be hiding gun in waistband, was on bike and ignored officer's commands to stop; "We see no objective basis in the evidence for reasonable suspicion at the time the defendant was seized . . . From the moment of the officers' first observation of the defendant until he slowed down and virtually halted pursuant to Officer Hernandez's second order to stop, the record shows (and the officer candidly admitted) that the police had no evidence or information—much less specific and articulable facts—creating the slightest suspicion that the defendant had committed, was in the course of committing, or was about to engage in any criminal conduct."); *Commonwealth v. Santos*, No. CR9711261, 2003 WL 22285308, at *4 (Mass. Super. Ct. Mar. 10, 2003) ("An individual may choose to ignore a police officer's inquiries. Walking away from an officer and refusing to answer questions, without more, cannot elevate the suspect's conduct to the level of reasonableness required for a seizure. . . . [T]he Defendant, in this case, did no more than refuse to answer officers' questions before he fled. Therefore, while the Defendant's flight adds to the degree of suspicion present in this case, it is not enough to meet constitutional requirements.") (internal citations omitted); *United States v. Freeman*, 735 F.3d 92, 102 (2d Cir. 2013) ("[A]t the time the officers initially approached Freeman, they did not have reasonable suspicion to stop him . . . As the police lacked reasonable suspicion, Freeman certainly had the right to ignore the officers and continue on his way. Freeman merely continued walking in the same direction, and ostensibly at the same pace, as the police never contended otherwise. If we accepted the government's argument that such a simple refusal to comply could create reasonable suspicion where none existed before, we would create a truly paradoxical class of individuals: individuals who cannot be stopped by officers, but who can be stopped if they refuse to stop.") (internal citation

omitted); *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) ("[Defendants] argue that Officer

Estrada had reasonable suspicion to stop and detain Plaintiff because the officer reasonably believed

that Plaintiff was trying to avoid him by making several turns and then parking next to a dumpster in

a darkened alley. . . . Officer Estrada did not have reasonable suspicion to initiate the stop: Plaintiff

had violated no traffic laws, and he did not engage in headlong flight upon seeing Officer Estrada.

Thus, even if Officer Estrada reasonably suspected that Plaintiff was avoiding him, such

noncooperation, without more, does not support a suspicion that Plaintiff was engaged in criminal

activity.") (internal citations omitted); *United States v. Keith*, 559 F.3d 499, 505-06 (6th Cir. 2009) (no

reasonable suspicion where, near 2:00 a.m. in a liquor store parking lot where drug trafficking was

known to occur, two men moved to the far side of the building after one glanced toward officers);

*Patterson v. City of Cleveland*, No. 97-4226, 1999 WL 68576, at *1, *6 (6th Cir. Jan. 21, 1999) (no

reasonable suspicion where two African-American men in a high crime drug area were "involved in

some type of exchange . . . huddled together on the sidewalk" and who, when police arrived, "pulled

their hands apart" and quickly walked away).

Controlling case law is clear that where there is no reasonable suspicion, a pedestrian is not

required to engage with the police. Patrol officers routinely encounter pedestrians daily, and this is a

basic, fundamental rule that officers know and is not related to a technical or specialty area of police

investigation. It is inconceivable that police officers in a busy city like Springfield would not be

familiar with the rules governing reasonable suspicion or a pedestrian's right to ignore an officer's

questions. This is especially true for a police officer trained to serve in Massachusetts, where state

constitutional protections go further than the Fourth Amendment. Nevertheless, in contravention of

these longstanding principles, Defendant Cicero testified and defense counsel argued that the *Terry*

stop and the events that followed would not have happened had Plaintiff simply answered

Defendants' questions. But, when they initially approached him, Plaintiff was not under any

22

obligation to do so. Defendants could not articulate facts suggesting that criminal activity was afoot or that Plaintiff was involved in any criminal activity. As a result, Defendants' conduct was unreasonable and fell "outside the universe of protected mistakes." *Morelli*, 552 F.3d at 24. Defendants are not entitled to qualified immunity on either Count I or II.

## IV.    PLAINTIFF'S MOTION FOR A NEW TRIAL

Because the court granted Plaintiff's renewed motion for judgment as a matter of law with respect to Counts I and II, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1) ("If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial."). The court may grant a new trial under Fed. R. Civ. P. 59 "if the verdict is against the weight of the evidence or if the action is required in order to prevent injustice." *Mejías-Aguayo v. Doreste-Rodríguez*, 863 F.3d 50, 54 (1st Cir. 2017) (internal quotation marks and citations omitted).

Plaintiff did not make any argument supporting his request for a new trial. His only reference to a new trial is in the title of his motion: "Plaintiff's Renewed Motion for Judgment as a Mater of Law or in the Alternative a New Trial." (Plaintiff's Motion (Dkt. No. 123).) Defendants, on the other hand, addressed the issue of a new trial, arguing one is not warranted because the verdict was not against the weight of the evidence, upholding the verdict will not result in a miscarriage of justice, and the trial was fair.

Because Plaintiff did not sufficiently raise any argument for a new trial, his request for a new trial is conditionally denied.

## V.      CONCLUSION

For the reasons set forth above, Plaintiff's renewed motion for judgment as a matter of law on Counts I and II or, in the alternative, for a new trial is GRANTED in part and DENIED in part. Specifically, Plaintiff's renewed motion for judgment as a matter of law on Counts I and II is granted, and Defendants are not entitled to qualified immunity. Plaintiff's motion for a new trial is conditionally denied. A separate order will issue setting a briefing schedule on the issue of damages.


It is So Ordered.

  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge