UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
GEORGE GUNTER,                                      )
                            Plaintiff               )
                                                    )
v.                                                  )      CIVIL ACTION NO. 3:16-CV-30183-MGM
                                                    )
ANTHONY O. CICERO and                               )
JOHN LOPEZ,                                         )
                            Defendants              )
_____)

**PLAINTIFF'S MEMORANDUM OF LAW REGARDING DAMAGES**

ARGUMENT

Damages for violations of constitutional rights, both under 42 U.S.C. § 1983 ("§ 1983") and G.L. c. 12, § 11I ("MCRA"), are "determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986). Such damages fall into two categories, compensatory and punitive. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" Id. quoting Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001). "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." Id. citing Cooper Indus., Inc., 52 U.S. at 432.

In the case at bar, the Defendants should be assessed both compensatory and punitive damages for their unlawful seizure of the Plaintiff.

I.    THE PLAINTIFF IS ENTITLED TO AN AWARD OF COMPENSATORY
      DAMAGES.

An award of compensatory damages in a civil rights action is not limited to monetary harms, but also includes such injuries as indignity, embarrassment, humiliation, fear, anxiety,

anger, mental anguish, and impairment of reputation.  See Memphis Cmty. Sch. Dist., 477 U.S. at 307 quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974); Carey v. Piphus, 435 U.S. 247, 265 n.22 (1978) (discussing cases where damages for humiliation, distress, embarrassment, and discomfort properly awarded for unlawful seizure); Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 45 (1st Cir. 2011) (noting damages for anxiety, anger, and fear compensable in civil rights action); Schiller v. Strangis, 540 F. Supp. 605, 621 (D. Mass. 1982) (awarding compensatory damages for "fear, humiliation, intimidation, frustration, and indignation" plaintiff experienced when unlawfully seized by police); Sexton v. Gibbs, F. Supp. 134, 143 (N.D. Tex. 1970) (awarding damages for "humiliation, embarrassment and discomfort" plaintiff suffered from unlawful seizure); Rhoads v. Horvat, 270 F. Supp. 307, 311 (D. Col. 1967) (awarding damages for "outrage" plaintiff suffered from unlawful seizure); Ross v. Michael, 140 N.E. 292, 293 (Mass. 1923) (holding assault victim entitled to recover damages for humiliation, indignity, and injury to feelings).

An award of compensatory damages may also include any "physical injury, pain and suffering, . . . shock, and discomfort the plaintiff has suffered, and is reasonably certain to suffer in the future, because of the defendant's conduct."  Barbosa v. Hyland, No. CIV.A. 11-11997-JGD, 2013 WL 6244157, at *21 (D. Mass. Dec. 2, 2013) citing Martin A. Schwartz & George C. Pratt, Section 1983 Litigation Jury Instructions, § 18.01.1 (Aspen Publishers 2013).

Additionally, an award of compensatory damages may also include any time the plaintiff spent while incarcerated after being unlawfully seized by law enforcement.  See Manuel v. City of Joliet, Ill., 137 S.Ct. 911, 920 (2017) (holding "Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process").

In the case at bar, the Plaintiff is entitled to be compensated for the following damages: (1) the indignity, embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of reputation that he suffered as a result of the unlawful seizure on Falcon's Way, (2) the physical pain and suffering that he endured as a result of the unlawful seizure on Falcon's Way, and (3) the time that he spent while incarcerated awaiting trial as a result of the unlawful seizure on Falcon's Way.

A.    The Plaintiff Is Entitled To Be Compensated For The Indignity, Embarrassment, Humiliation, Fear, Anxiety, Anger, Mental Anguish, And Impairment Of Reputation That He Suffered As A Result Of The Unlawful Seizure On Falcon's Way.

A plaintiff who has been unlawfully seized by law enforcement in violation of the Fourth Amendment to the United States Constitution ("Fourth Amendment") and/or Article Fourteen of the Massachusetts Declaration of Rights ("Article 14") may recover compensatory damages for any indignity, embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of reputation that he suffers as a result of the violation of his physical integrity. See Memphis Cmty. Sch. Dist., 477 U.S. at 307 quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974); Carey v. Piphus, 435 U.S. 247, 265 n.22 (1978); Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 45 (1st Cir. 2011); Sexton v. Gibbs, F. Supp. 134, 143 (N.D. Tex. 1970); Rhoads v. Horvat, 270 F. Supp. 307, 311 (D. Col. 1967); Ross v. Michael, 140 N.E. 292, 293 (Mass. 1923); Schiller v. Strangis, 540 F. Supp. 605, 621 (D. Mass. 1982). "Humiliation can be inferred from the circumstances as well as established by the testimony." Carey, 435 U.S. at 265 n.22 quoting Seaton v. Sky Realty Co., 491 F.2d 634, 636 (7th Cir. 1974).

In Rhoads v. Horvat, the plaintiff was unlawfully seized by law enforcement and detained for approximately thirty to forty-five minutes before being released. 270 F. Supp. at 309. Although the plaintiff suffered no physical injuries or monetary losses as a result of the unlawful

seizure, the Court held that an award of $5,000.00 in compensatory damages was appropriate.[1]

Id. at 311.  In so holding, the Court noted that "[a]part from special monetary damages it is open

to the jury in a case such as this to make a determination as to the amount that plaintiff is entitled

to be awarded for the deprivation.  This, of course, would include his subjective pain and

suffering and humiliation."  Id. at 310.  The Court reasoned that

> In the case at bar we do not doubt that the plaintiff was outraged by the arrest.
> His main reaction was one of zeal to uphold the right which had been invaded.
> Secondary concerns were apprehension about inability to keep a date with a
> young lady on the night in question and embarrassment because of jocular
> remarks of his colleagues.  Id. at 311.

Similar to the plaintiff in Rhoads, the Plaintiff in the case at bar suffered indignity,

embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of his

reputation when the Defendants unlawfully seized him on Falcon's Way in violation of his rights

under the Fourth Amendment and Article 14.  Said injuries, particularly the personal indignity

and humiliation, can be inferred from the circumstances, but are also clearly supported by the

trial record.

At trial, the Plaintiff described the indignation he experienced when the Defendants

seized him on Falcon's Way as follows:

Q. Okay. And how did you respond to him telling you to get against the wall?

A. Like, with an attitude, kind of, like, "Get against the wall." "Get against the

wall for what," like, because I didn't do anything, so. At that point, I stopped, and

I turned around and I looked at him, like, "Get against the wall for what?" Up

until then, I didn't really -- up until then I kept my same pace. I wasn't running or

nothing or walking fast. I was just cruising. I'm going to get some chicken. I was

---

[1] Accounting for inflation, $5,000.00 in 1967 is the equivalent of $37, 840.72 in 2019.  See
www.usinflationcalculator.com.

satisfied after my visit with my lady friend, and my birthday was coming. I was in a good mood. I was not irritable or anything other than him telling me to get against the wall, and ***I was offended by it***, like, "For what?" Like, "I didn't do anything." (10/29/18 Trial Tr. (Dkt. No. 135) at 12:6-18) (emphasis added).

The Plaintiff described the fear and anxiety he experienced, and continues to experience, as a result of being seized by the Defendants on Falcon's Way as follows:

Q. So did you stop at this point on the other side of the street?

A. Yes, I stopped. Now I'm just like stopped in ***fear***, like in the headlight, what's going on, why is he getting out of the car, why does he have the stick, why is he walking towards me?  (<u>Id.</u> at 63:7-11) (emphasis added).

* * *

Q. What was going through your mind at that point in time?

A. That they was going to hit me with that object and ***kill me*** on the side of the road because there ain't nobody out here, and police kill black people and get away with it.  (<u>Id.</u> at 14:6-9) (emphasis added).

* * *

Q. Can you please tell the jury why you ran?

A. Because I didn't want them to ***kill me***. I didn't want them to --

MS. SHEEHAN: Objection, Your Honor.

THE COURT: Overruled.

A. How is that objection? You asked me a question. I don't want them to ***kill me***. There's nothing that was going on in my mind, there's nothing else pulsating through my blood and my veins other than these two people had me on the side of

the road, in the middle of the night, and ***there ain't nobody around there to help me***, and they're trying to beat me with the stick. They are trying to beat me. They're trying to hit me and attack me and hurt me, and ***I want to get away from that***. That's what's on my mind. That's why I ran. That's what' going on.  (Id. at 17:5-19) (emphasis added).

* * *

Q. What was going through your mind when you were hiding there?

A. I don't want to say because every time I say it, you all keep telling me objection or whatever. That they are going to ***kill me***. They are going to ***kill me***. They already did whatever they did over there. Now they're coming. They have got more of them. They have got a dog. I feel like they are going to ***sic the dog on me***. They are going to let the dog bite me. They're going to ***beat me***. And I'm behind something worse than what I was at before. Now really secluded. Now -- before at least I was on the street in the hope that somebody might pass by and see something, but ain't nobody going to say something if they see the cops beating on somebody. They are going to think I did something and the police are doing their job. But if they're behind some building, in some whatever this is -- I don't know what it is I'm in, and they've behind there and it's just them and me, that's what's going on in my mind. I don't want to be caught in this situation. ***Please, God, don't let them catch me back here***.  (Id. at 20:13-25, 21:1-7) (emphasis added).

* * *

Q. Now, Mr. Gunter, since the criminal trial concluded, since this incident, can

you tell the jury how this incident has affected you?

A. I don't go out. I don't go out no more. I have no desire to see downtown or for a strip club or nothing like that. The police, they -- what's the word I'm looking for? What's the word? Like make me ***nervous***, like make me -- what's the word I'm looking for -- ***nervous***. I don't know another word besides ***nervous***, even when I'm not doing nothing. Even when I'm not doing nothing, just the sight of them, seeing the car, or even going back around that same area, I don't know. I don't know what else to say.  (<u>Id.</u> at 43:11-22) (emphasis added).

The Plaintiff described the embarrassment, anger, and humiliation he suffered as follows:

Q. And while this was happening, were any of the officers saying anything to you?

A. Yeah, they were saying things.

Q. What were they saying?

A. They were calling me stuff. Calling me out my name, you know, the typical run of the mill. They called me a "nigger," but that don't -- that didn't faze me. They always say that. What really got me mad is that ***Lopez called me a savage*** for running. ***That offended me***. I didn't say anything to them like to get an attitude with them other than that, until Lopez said I was a savage for running so I got an attitude, and ***I got offended with that***. I called him the savage. I'm like "You the savage. You all the savages because I wasn't doing anything, and for me to run because you all beating me in the head only make sense. You all the savages." (<u>Id.</u> at 23:17-25, 24:1-6) (emphasis added).

Finally, the Plaintiff testified regarding both the mental anguish he suffered and the impairment of his reputation in the eyes of his child's mother as follows:

> Q. Now, Mr. Gunter, those records also indicate that you had some prior history of experiencing anxiety and depression. Can you tell the jury how those -- how your anxiety and depression was affected by this incident?
>
> A. It didn't make it no better. It made it -- it made me --what's the word I'm looking for? ***Paranoid***. I was paranoid because I wasn't able to really protect myself the way I really feel comfortable protecting myself in this situation, being in jail and with criminals, real criminals that really try to hurt you, take your stuff, and I wasn't really able to, like, fend them off. And then I started being ***morbid***, just started thinking about the whole fact, like no matter what I do and how I started to try to change my life or the changes I make in my life, jail was always the end resort, because at this time I wasn't doing anything. I was getting into college. I had a job, all that. I was finally getting to see my son that I wasn't able to see, and due to this, ***my baby mom left me and took the kid***. I was thinking about that day in and day out. ***I'm trying to convince her that I'm innocent and I didn't do anything, and she don't want to hear it***. (Id. at 38:4-25, 39:1) (emphasis added).

The Defendants' unlawful seizure of the Plaintiff on Falcon's Way was the direct cause of the indignity, embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of reputation that the Plaintiff suffered.[2]  Therefore, this Honorable Court should follow the holding

---

[2] Regrettably, the indignity, embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of reputation that the Plaintiff suffered as a result of being unlawfully seized by the Defendants is not at all unique or surprising.  It is well documented that members of the

and reasoning of the court in <u>Rhoads,</u> and award the Plaintiff compensatory damages for said

injuries in the amount of $75,000.00.

B.    <u>The Plaintiff Is Entitled To Be Compensated For The Physical Pain And Suffering He
      Endured As A Result Of The Unlawful Seizure On Falcon's Way.</u>

It is well settled that an award of compensatory damages may include any

"physical injury, pain and suffering, . . . shock, and discomfort the plaintiff has suffered, and is

reasonably certain to suffer in the future, because of the defendant's conduct." <u>Barbosa v.</u>

<u>Hyland</u>, No. CIV.A. 11-11997-JGD, 2013 WL 6244157, at *21 (D. Mass. Dec. 2, 2013) <u>citing</u>

---

African American community have been suffering from these types of emotional injuries at the
hands of law enforcement dating back to the civil rights era and ever farther beyond to the dark
days of slavery.  <u>See</u> Nikole Hannah-Jones, <u>Yes, Black America Fears the Police, Here's Why</u>,
ProPublica, March 4, 2015, <u>https://www.propublica.org/article/yes-black-america-fears-the-
police-heres-why</u> ("For black Americans, policing is 'the most enduring aspect of the struggle
for civil rights'").  It is also well documented that the African American community is
disproportionally impacted by unlawful seizures by police, whether it be in the context of motor
vehicle stops or <u>Terry</u>-style "stop-and-frisks".  Greg Ridgeway, RAND Corp., <u>Analysis of Racial
Disparities in the New York Police Department's Stop, Question, and Frisk Practices</u>, (2007),
<u>available at</u> <u>https://www.rand.org/pubs/technical_reports/TR534.html</u> (analyzing empirical data
showing 89% of <u>Terry</u> stops by NYPD in 2006 involved nonwhites: 53% of stops involved black
suspects, 29% Hispanic, 11% white, and 3% percent Asian, with 45% of black and Hispanic
suspects being frisked, compared with 29% of white suspects); <u>The Stanford Open Policing
Project</u> (2019), <u>https://openpolicing.stanford.edu/findings/</u> (analyzing empirical data showing
black motorists stopped at higher rates than white motorists, and twice as likely to be searched).
Studies have affirmed that this disparate impact of police seizures has a direct negative effect
upon the health, both mental and physical, of African Americans.  Geller, Fagan, Tyler, and
Link, <u>Aggressive Policing and the Mental Health of Young Urban Men</u>, 104(12) Am. J. Pub.
Health        2321,        2324        (December        2014)        <u>available        at</u>
<u>https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139/</u> (finding young men who are routinely
stopped by police display "compromised mental health", particularly "higher levels of anxiety
and trauma"); Alang, McAlpine, McCreedy, and Hardeman, <u>Police Brutality and Black Health:
Setting the Agenda for Public Health Scholars</u>, 107(5) Am. J. Pub. Health 662 (May 2017)
<u>available at</u>   <u>https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5388955/</u>   (noting   experiencing
"reoccurring and persistent" stressors of "witnessing or experiencing harassment [and] routine
unwarranted searches . . . causes rapid wear and tear on body organs and elevated allostatic load"
leading to increased frequency of "diabetes, stroke, ulcers, cognitive impairment, autoimmune
disorders, accelerated aging, and death" in African American community).

Martin A. Schwartz & George C. Pratt, <u>Section 1983 Litigation Jury Instructions</u>, § 18.01.1 (Aspen Publishers 2013).

In the case at bar, the Plaintiff described the physical injuries he suffered at the hands of the Defendants as follows[3]:

Q. So the back of your head. Now, as a result of being hit in the back of the head, did you sustain an injury there?

A. Yeah.

Q. Can you tell the jury a little bit about that injury.

A. I had like a knot. I had like a knot there. It swelled up, and then months later the hair never grew back there.[4] It gave me headaches. I didn't know it until I got to Ludlow, and they put them bright lights on. It was like making me real sensitive to the lights to the point where I start seeing dots, like, they really hurt, like right back here. It started making my head hurt there (indicating). I tried to tell the people at Ludlow. They gave me Motrin.

Q. Mr. Gunter, before we get to that, I want to return to -- you said there was a spot on the back of your head where you were hit doesn't grow hair anymore?

A. Yeah.

Q. Is that true to this day?

A. What?

Q. That it doesn't grow hair in that spot anymore.

---

[3] Although the Defendants disputed the level of physical force described by the Plaintiff, both Defendants admitted that the Defendant, John Lopez, struck the Plaintiff with a closed fist when they seized the Plaintiff on Falcon's Way.  (10/30/18 Trial Tr. (Dkt. No. 133) at 145:18-22, 204:2-8).

[4] Photographs of the area where the knot formed and hair ceased to grow were introduced as Plaintiff's Exhibit No. 2.

A. Yeah, it don't grow here. That's why I start trying to grow my hair longer so I can try to hide it. I was embarrassed about it. Every time somebody go, "Hey, you have got a spot on the back of your head," and then they won. Then I have got to tell the story of how the police victimized me, and that ain't hot. (10/29/18 Trial Tr. (Dkt. No. 135) at 24:15-25, 25:1-14).

* * *

Q. Now, when you got to the jail, did you report your injuries to the people there?

A. Yes.

Q. And can you tell the jury how you were feeling physically while you were at the jail?

A. How I was feeling what? Physically?

Q. Yes. How were you feeling?

A. I was hurting. My back hurt. My back hurt. My head was the main -- my head was the main focal point of all my pain because it was hurting -- because my back hurt, but it seemed like it would go away but then come back. But the head was just, like, throbbing, like, nonstop, like no matter what. Then the lights -- I don't know what kind of lights they have got in jail, but them lights is just like always on and at the highest voltage or whatever. They were just tearing my eyes up. They just made me nauseous. It made me, like, dizzy. It made me only want to lay in my bed, but then at the same time laying in my bed make my back hurt, and laying on my side make my side hurt. There was no relief no matter what I did. I couldn't work out or nothing. I couldn't do nothing. Sometimes it would get so bad to the point I couldn't -- even like when walking. I say I couldn't go down the

stairs, but walking down the stairs was something. It made it an issue to walk down the stairs. Like it hurt to walk downs stairs, all that.  (Id. at 31:12-25, 32:1-11).

* * *

Q. Can you tell the jury approximately how long it took for your rib pain to go away?

A. Probably like three weeks I started to feel a little better.

Q. What about your back pain; how long did it take for that to resolve?

A. Probably like, I don't know, probably like a month and a half, almost two.

Q. Now, did they give you any treatment for your rib and back pain when you were at the jail?

A. They gave me Motrin.

Q. Did that help at all?

A. No.

Q. Now, what about your headaches and the sensitivity to light and dizziness that you described? How long did it take for those symptoms to go away?

A. Probably like seven months, eight months. Even when I got out of jail, my head and stuff was still, depending on certain situations and lighting, would still make my head hurt. But from it being the severest, it probably stopped around, like, four months, five months.  (Id. at 33:23-25, 34:1-18).

The physical injuries described by the Plaintiff were corroborated by the medical records from the Hampden County Corrections Center, which were entered into evidence as Plaintiff's Exhibit No. 5.  Specifically, the medical records indicate that on his initial intake on September

15, 2015, the Plaintiff reported suffering from "back spasms" and "rib soreness from arrest".[5] (10/30/18 Trial Tr. (Dkt. No. 133) at 31:1-8; Plaintiff's Exhibit No. 5, p. 2).  Additionally, the records indicate that on November 9, 2015, the Plaintiff "reports at time of arrest sustained head injury; has had headaches since that time two months ago, gradually decreasing in frequency." (10/30/18 Trial Tr. (Dkt. No. 133) at 71:2-7; Plaintiff's Exhibit No. 5, p. 24).  The medical records also indicate that a physical examination of the Plaintiff conducted on November 9, 2015 revealed a "small area to posterior head with scar tissue and limited hair growth. Tiny palpable rounded subcutaneous mass in same area consistent with hematoma." (10/30/18 Trial Tr. (Dkt. No. 133) at 71:15-21; Plaintiff's Exhibit No. 5, p. 26).  Finally, the records indicate that in the opinion of the examining physician's assistant, the Plaintiff was likely suffering from a "2/2 head trauma with mild post-concussive syndrome." (Plaintiff's Exhibit No. 5, p. 28).

The Defendants' unlawful seizure of the Plaintiff on Falcon's Way was the direct cause of the physical pain and suffering that the Plaintiff endured.  Therefore, this Honorable Court should award the Plaintiff compensatory damages for said injuries in the amount of $50,000.00.

C.      The Plaintiff Is Entitled To Be Compensated For The Time He Spent While Incarcerated Awaiting Trial As A Result Of The Unlawful Seizure On Falcon's Way.

A Plaintiff in a civil rights action is entitled to be compensated for any time spent while incarcerated awaiting trial after being unlawfully seized by law enforcement.  See Manuel v. City of Joliet, Ill., 137 S.Ct. 911, 920 (2017) (holding "Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process").

In the case at bar, after the Defendants seized the Plaintiff, they charged him with two counts of Assault and Battery on a Police Officer and one count of Resisting Arrest.  (10/29/18

---

[5] No physical examination of the Plaintiff was conducted until November 9, 2015.  (10/30/18 Trial Tr. (Dkt. No. 133) at 69:17-25, 70:1-18).

Trial Tr. (Dkt. No. 135) at 30:16-25, 31:1-6). The Plaintiff was arraigned before the Springfield

District Court later that morning on said charges. (Id.) At arraignment, the court set bail in an

amount that the Plaintiff could not afford. (Id.) Consequently, the Plaintiff was incarcerated for

a period of ninety (90) days; from the date of his unlawful seizure on September 15, 2015 until

he was acquitted by a jury on December 15, 2015. (Id. at 39:3-11).[6]

During this period of incarceration, the Plaintiff suffered increased anxiety and emotional

distress, which he described as follows:

Q. Now, Mr. Gunter, those records also indicate that you had some prior history

of experiencing anxiety and depression. Can you tell the jury how those -- how

your anxiety and depression was affected by this incident?

A. It didn't make it no better. It made it -- it made me --what's the word I'm

looking for? *Paranoid*. I was paranoid because I wasn't able to really protect

myself the way I really feel comfortable protecting myself in this situation, being

in jail and with criminals, real criminals that really try to hurt you, take your stuff,

and I wasn't really able to, like, fend them off. And then I started being *morbid*,

just started thinking about the whole fact, like no matter what I do and how I

started to try to change my life or the changes I make in my life, jail was always

the end resort, because at this time I wasn't doing anything. I was getting into

college. I had a job, all that. I was finally getting to see my son that I wasn't able

to see, and due to this, my baby mom left me and took the kid. I was thinking

about that day in and day out. I'm trying to convince her that I'm innocent and I

didn't do anything, and she don't want to hear it. I don't know. What else you

---

[6] The docket from the Plaintiff's criminal trial, No. 1523CR6546, which documents the charges, the bail, and period of incarceration, was introduced as Plaintiff's Exhibit No. 6.

want? I don't know.   (10/29/18 Trial Tr. (Dkt. No. 135) at 38:4-25, 39:1-2) (emphasis added).

\* \* \*

A. Yes, fairly so because I spent three months just talking about it. Everybody kept asking me what are you here for? What are you here for? Every time you go somewhere, you have to explain what are you there for. That's what I'm there for. I always said it. I'd been there; it just happened; it was fresh. ***It's troubling me; it's stressing me out. I'm stressing about it every day. I'm loosing my family over it***. Yeah, I remember it a lot better than I remembered it after I was free and having other problems in my life and living life, going on about life. (10/30/18 Trial Tr. (Dkt. No. 133) at 91:7-17) (emphasis added).

The medical records also corroborate that on November 5, 2015 the Plaintiff "reports experiencing 'increased anxiety' due to his upcoming court date.  He shares that he returns to court on Tuesday and is 'unsure' what will happen." (Plaintiff's Exhibit No. 5, p. 20).

The Defendants' unlawful seizure of the Plaintiff on Falcon's Way was the direct cause of the 90-day period of incarceration and associated increased anxiety and emotional distress that the Plaintiff suffered while incarcerated awaiting trial.  Therefore, this Honorable Court should award the Plaintiff compensatory damages for said injuries in the amount of $125,000.00.

II.    THE DEFENDANTS SHOULD BE ASSESSED PUNITIVE DAMAGES FOR THEIR
        UNLAWFUL SEIZURE OF THE PLAINTIFF.

An award of punitive damages in a § 1983 action is appropriate where the defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the plaintiff's federally protected rights.   Smith v. Wade, 461 U.S. 30, 30 (1983).   This standard is satisfied where the defendant acts in the face of a perceived risk that his actions

would violate the plaintiff's rights under federal law.  Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999) quoting Kolstad v. American Dental Ass'n., 527 U.S. 526, 536 (1999).  The purpose of punitive damages is "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  Smith, 461 U.S. at 54 quoting Restatement (Second) of Torts § 908(1) (1977).  When a plaintiff suffers relatively minor injury, and compensatory damages are inadequate to deter future similar wrongdoing by the defendant, an award of punitive damages is particularly appropriate.  See Schiller v. Strangis, 540 F. Supp. 605, 623 (D. Mass. 1982) (awarding punitive damages against police officer for unlawful seizure of plaintiff where compensatory damages insufficient to deter future wrongful conduct).  Punitive damages are also particularly appropriate to deter future wrongdoing where a defendant police officer maintains at trial that his actions were lawful.  Id.

In the case at bar, the Defendants' unlawful seizure of the Plaintiff on Falcon's Way was reckless and was committed with callous indifference to the Plaintiff's right to be free from unreasonable seizure under both the Fourth Amendment and Article 14.  This fact is best evidenced by the Court's previous findings on the issue of qualified immunity.  As the Court rightfully concluded:

> Controlling case law is clear that where there is no reasonable suspicion, a pedestrian is not required to engage with the police. Patrol officers routinely encounter pedestrians daily, and this is a basic, fundamental rule that officers know and is not related to a technical or specialty area of police investigation. *It is inconceivable that police officers in a busy city like Springfield would not be familiar with the rules governing reasonable suspicion or a pedestrian's right to ignore an officer's questions. This is especially true for a police officer trained to serve in Massachusetts, where state constitutional protections go further than the Fourth Amendment.* Nevertheless, in contravention of these longstanding principles, Defendant Cicero testified and defense counsel argued that the Terry stop and the events that followed would not have happened had Plaintiff simply answered Defendants' questions. But, when they initially approached him, Plaintiff was not under any obligation to do so. Defendants could not articulate facts suggesting that criminal activity was afoot or that Plaintiff was involved in

any criminal activity. As a result, Defendants' conduct was unreasonable and fell "outside the universe of protected mistakes." (Memorandum and Order Regarding Plaintiffs Renewed Motion For Judgment As A Matter Of Law, Or In The Alternative, For A New Trial (Docket No. 139) at 22-23) (emphasis added).

An award of punitive damages is especially necessary in this case in order to deter both Defendants, as well as other members of the Springfield Police Department, in the future from unlawfully seizing other citizens who simply choose not to answer questions in the absence of reasonable suspicion of criminal activity.[7]  The need for such deterrence is apparent from the Defendants' ongoing mistaken belief that their conduct was lawful.[8]  In light of the Defendants' intransigence, an award of punitive damages is not only appropriate and necessary in this case, it is absolutely imperative in order to firmly communicate to the Defendants and the entire Springfield Police Department that the era of Springfield Police officers callously, and with impunity, violating the civil rights of the populace is over.  If the Court does not deliver this message by means of a substantial punitive damages award, there is a substantial risk that the Defendants and other members of the Springfield Police Department will continue treat other members of the public, particularly members of the African American community, in the same unlawful manner as the Plaintiff was treated.

Moreover, unlawful *Terry*-style stop-and-frisk detentions of young African American men, like the one perpetrated by the Defendants against the Plaintiff in this case,  are a vestige of racism that has a detrimental impact upon not only the physical and mental wellbeing of the men directly affected, but also upon the collective psyche of the entire African American community. See Alang, McAlpine, McCreedy, and Hardeman, <u>Police Brutality and Black Health:  Setting the</u>

---

[7] Both Defendants are still employed as officers of the Springfield Police Department.  (10/30/18 Trial Tr. (Dkt. No. 133) at 101:18-19; 155:4-6)
[8] The Defendant, Anthony Cicero, maintained at trial that he and the Defendant, John Lopez, had "reasonable suspicion" to stop the Plaintiff.  (10/30/18 Trial Tr. (Dkt. No. 133) at 141:10-14).

Agenda for Public Health Scholars, 107(5) Am. J. Pub. Health 662 (May 2017) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5388955/ (noting police harassment and brutality "is a constant reminder of the historic and current devaluing of Black lives . . . , sends a signal that there is little hope for justice . . . and might increase feelings of powerlessness in the Black community, diminishing gains made by the civil rights movement"). Such conduct reinforces the notion that African Americans are second-class citizens and ultimately makes community policing much more difficult due to the reluctance of African Americans to trust and interact with the police. Id. Accountability for unlawful police conduct, in the form of a substantial award of punitive damages, is a necessary step in restoring the African American community's trust in the criminal justice system.

Therefore, because the Defendants' unlawful seizure of the Plaintiff on Falcon's Way was reckless and was committed in callous indifference to the Plaintiff's constitutional rights under the Fourth Amendment and Article 14, this Honorable Court should hold the Defendants accountable for their violation of the Plaintiff's constitutional rights in order to deter any such future conduct by assessing a punitive damages award against them in the amount of $250,000.00.

CONCLUSION

For the reasons stated herein, the Plaintiff prays that this Honorable Court assess damages against the Defendants as follows:

(1)     Compensatory damages for the indignity, embarrassment, humiliation, fear, anxiety, anger, mental anguish, and impairment of reputation that the Plaintiff suffered as a result of the unlawful seizure on Falcon's Way in the amount of $75,000.00;

(2)     Compensatory damages for the physical pain and suffering the Plaintiff endured as a result of the unlawful seizure on Falcon's Way in the amount of $50,000.00;

(3)     Compensatory damages for the ninety (90) days the Plaintiff spent while incarcerated awaiting trial as a result of the unlawful seizure on Falcon's Way in the amount of $125,000.00; and

(4)     Punitive damages for the reckless and callous violation of the Plaintiff's constitutional rights in the amount of $250,000.00.

Respectfully Submitted,


Dated: April 1, 2019                    By: */s/ Peter Alexander Slepchuk*
                                        Peter Alexander Slepchuk, BBO#: 682078
                                        Attorney for the Plaintiff
                                        155 Maple Street, Suite 405
                                        Springfield, MA 01105
                                        Tel: 413-736-3649; Fax: 413-747-9022
                                        E-mail: peter.alexander@slepchuklaw.com


## CERTIFICATE OF SERVICE

I, Peter Alexander Slepchuk, hereby certify that on this 1st day of April, 2019, I served this document upon counsel for the Defendants and all registered parties via the ECF Notice of Electronic Filing (NEF) system.

Dated: April 1, 2019                                    */s/ Peter Alexander Slepchuk*
                                                       Peter Alexander Slepchuk